UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KENNETH BELLET,

                              Plaintiff,

v.

CITY OF BUFFALO, ET AL.,

                              Defendants.
_____

**REPORT AND RECOMMENDATION**

03-CV-00027(S)(M)

        This case was referred to me by Hon. William M. Skretny "to hear and report upon dispositive motions" in accordance with 28 U.S.C. 636(b)(1) (Dkt. #93). Before me is the motion of defendant Rita Eisenbeis for summary judgment [92].[1] For the following reasons, I recommend that this motion be DENIED.

**BACKGROUND**

**1.      Plaintiff's Allegations**

        Plaintiff's Amended Complaint alleges that for approximately 8 years, his minor grandson, Jerome Walsh, Jr., was in his lawful care and custody. Amended Complaint [4], ¶12. According to plaintiff, on January 13, 2000, his grandson did not return from his school, Buffalo Public School #72. Id. The next morning he called Ms. Eisenbeis, the school's principal, who advised him to come to the school with documentation that he was his grandson's legal guardian. Id. When plaintiff arrived at the school, he had a confrontation with Detective Borrelli, which resulted in his arrest. Id. at ¶13. Although a Child Protection worker had asked plaintiff where

---

      [1]      Bracketed references are to CM-ECF docket entries.

he wanted his grandson to be taken, Ms. Eisenbeis refused his request to have him taken to plaintiff's girlfriend, Linda Kaiser, who had helped raise him. Id. at ¶16.

The following day the grandson's father, Jerome Walsh, Sr., petitioned for custody of the grandson. Id. at ¶¶16, 18. Plaintiff alleges that he cross-petitioned, and was granted custody of his grandson. Id. at ¶18. "However [the grandson] would not go to school as [he] was a victim of hate crime there and couldn't stand the school. He had only a few months to go to graduate". Id. Therefore, plaintiff "filed a petition and considered injunctive relieve to stop the school from allowing hate rimes [*sic*] to continue. When [plaintiff] went to Family Court to resolve this problem", Ms. Eisenbeis and other defendants "influenced the Court to try me for neglect. . . . [E]ach defendant(from the school) had conspired . . . to perjure themselves [*sic*] to deprive me of a family relationship." Id. Plaintiff further alleges that Ms. Eisenbeis and other school personnel "conspired and encouraged, assisting Mr. Walsh in the unlawful taking of [the grandson] . . . and . . . to destroy the [grandson's] and the plaintiffs [*sic*] family relationship." Id.

By Decision and Order dated November 18, 2004, Judge Skretny dismissed with prejudice plaintiff's state law claims against Eisenbeis. [10], p. 15. However, he permitted plaintiff's substantive and procedural due process claims against Ms. Eisenbeis to proceed, finding, *inter alia*, that the "Court cannot foreclose the possibility that Plaintiff's Amended Complaint, when liberally construed, alleges a procedural due process claim against . . . Eisenbeis . . . which relates to the removal of Plaintiff's grandson from his custody." Id., pp. 9-10.[2]

---

[2] Although Judge Skretny vacated his November 8, 2004 Decision and Order pending resolution of plaintiff's appeal [12], it was later reinstated [14].

**2.     The Factual Record**

With discovery completed, the limited record before me tells a story somewhat different from that alleged in the Amended Complaint. The grandson's biological mother, Marie Bellet, surrendered custody of him to his biological father Jerome Walsh, Sr. Opposing Affidavit of Kenneth Bellet [99], Ex. C, p. 4. In June 1993, Jerome Walsh, Sr. surrendered custody of the grandson to plaintiff. Id. at 5. The grandson continued to reside with plaintiff until January 13, 2000, when the grandson reported to Ms. Eisenbeis, the principal of School 72, that plaintiff had thrown him out of his house the previous evening and that plaintiff had repeatedly physically abused him. Affidavit of Denise Malican, Esq. [92-3], Ex. D, pp. 45-47, 64.[3] As a result, Eisenbeis reported plaintiff to Child Protection. That same day, Jerome Walsh, Sr. arrived at School 72 with papers indicating that he had custody of the grandson. Id., p. 48.

The following day, Jerome Walsh, Sr. brought the grandson to School 72. Id., p. 49. Plaintiff also arrived at School 72, and a confrontation ensued in Ms. Eisenbeis' office between plaintiff and defendant Detective Anthony Borrelli, who was investigating a missing persons report filed by plaintiff. Id., pp. 25-27, 50. This resulted in plaintiff's arrest. Id. Ms. Eisenbeis opposed the grandson being returned to plaintiff. Id. at p. 56. Therefore, the grandson was taken by Maureen McNamara, a school counselor, to Compass House. Id., pp. 28, 56-57, 94.

---

[3] In November 1999 the grandson made a similar report to Maureen McNamara, a counselor at School 72. After Ms. McNamara reported this to Child Protection and they declined to pick up the grandson, Ms. Eisenbeis called the police to pick him up. Affidavit of Denise Malican, Esq. [92-3], Ex. D, pp. 85-88. The grandson told Ms. Eisenbeis in January 2000 that plaintiff had beaten him until he wrote a letter indicating that November 1999 report was false. Id., p. 47.

On February 9, 2000, plaintiff filed a Person In Need of Supervision ("P.I.N.S") petition. Affidavit of Denise Malican, Esq. [92-3], Ex. D, p. 5; Opposing Affidavit of Kenneth Bellet [99], ¶22. During the investigation of this petition, the grandson was found to potentially be a neglected child. Thus, during the June 6, 2000 Family Court Proceeding before Hon. Marjorie Mix, the court converted the proceeding to a neglect petition. Id., p. 15. Plaintiff, Ms. Eisenbeis, Officer Borrelli, and Ms. McNamara testified at the June 6, 2000 hearing. Id., Ex. D. After concluding that plaintiff never had formal custody of the grandson and that the grandson would not be returned to plaintiff because the grandson did not wish to reside with him, the court dismissed the neglect petition. Id., Ex. E, pp. 7-11; Ex. F, p. 3. The court directed the county to investigate a proper placement for the grandson, who remained in foster care. However, Jerome Walsh, Sr. could not be contacted. Id., Ex. F, p. 2.

## DISCUSSION AND ANALYSIS

**1.        Defendant Eisenbeis Has Not Established Her Entitlement to Summary Judgment**

Defendant Eisenbeis argues that plaintiff cannot maintain his due process claims because "there is no indication from prevailing caselaw that [a protected liberty interest] extends to grandparents without legal custody of their grandchildren." Defendant Eisenbeis' Memorandum of Law [92-10], p. 3. She further argues that plaintiff was not deprived of a constitutional right because the grandson did not wish to return to plaintiff's custody. Id., pp. 3-4. Alternatively, she argues that even if plaintiff had a protected liberty interest, the state has a

significant interest in protecting children from abuse and she was required by law to take steps to remove the grandson from plaintiff's custody. Id., pp. 4-5.

### A. Plaintiff has Established a Protected Liberty Interest

"The first step in any Fourteenth Amendment inquiry is to identify the deprivation caused by the state action. . . . If the deprivation is not of life or property, the second question becomes whether or not the deprivation infringes upon a liberty interest protected by the Constitution." Luber v. Ross, 2006 WL 37466, *3 (N.D.N.Y. 2006). The deprivation in this case appears to be defendant Eisenbeis' refusal to return the grandson to plaintiff's custody on January 13, 2000.

Certain relationships have been found to be entitled to constitutional protection, including "the creation and sustenance of a family [and] marriage." Roberts v. United States Jaycees, 468 U.S. 609, 619 (1984). "Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." Id., pp. 619-20.

"The parent-child relationship, whether natural or formalized through adoption, properly forms the core of the constitutional notion of 'family'. . . . The constitutional conception of 'family' has evolved, however, to include relationships among members of what has commonly become known as the 'extended family.' . . . The courts have focused principally on the biological relationship between the parties when extending due process protection to persons not specifically fitting the parent-child mold." Rivera v. Marcus, 696 F.2d 1016, 1022 (2d Cir. 1982).

For example, in Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 505-06 (1977), the plurality of the Court held that an ordinance that limited occupancy of single dwelling units to members of a "family", which as defined in the ordinance prevented a grandmother from living with her grandchildren, violated the grandmother's liberty interest in being able to live with them. Id., pp. 505-06. In so holding, the Court noted that "the tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition. . . . Decisions concerning child rearing, which . . . other cases have recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household indeed who may take on major responsibility for the rearing of the children." Id., pp. 504-05.

Based upon Moore, it appears that a grandparent who resides with a grandchild may possess a protected liberty interest in such a relationship. *See, e.g.,* Watterson v. Page, 987 F.2d 1, 8 n.6 (1st Cir. 1993) ("appellants . . . as grandparents who resided with the girls, have

interests at least sufficient to avoid dismissal of their §1983 claims on grounds they have no constitutionally protected right at stake").

The Amended Complaint (¶12) and the affidavit of Marie Bellet allege that "in early February of 2000, Judge Marjorie Mix . . . granted [plaintiff] legal custody of [the grandchild]." Affidavit of Kenneth Bellet [99], Ex. C, ¶9. However, based upon the record before me, plaintiff lacked legal custody of the grandson during the time period at issue. *See* Affidavit of Denise Malican, Esq. [92-3], Ex. E, pp. 5 and 7; Ex. D, p. 4; Ex. F, p. 3.

Although he lacked legal custody of the grandson, it is undisputed that plaintiff was his grandson's primary caregiver for approximately seven years after his biological mother and father surrendered custody to plaintiff. *See* Opposing Affidavit of Kenneth Bellet [99], Ex. C, ¶¶1-7. Thus, notwithstanding the absence of legal custody, it appears that for all intents and purposes plaintiff acted as the grandson's parent, which I find sufficient to establish a triable issue of fact as to whether he possessed a protected liberty interest. "Despite the absence of compelling authority for holding that grandparents . . ever have a liberty interest under the due process clause, we draw back from concluding that they never do. Like the grandmother in the <u>Moore</u> case, Mrs. Ellis during much of the lives of these unfortunate children took the place of totally inadequate parents. . . . Mrs. Ellis was in loco parentis to these children when the defendants took them away from her; and we are reluctant to conclude that a great-aunt, an adoptive grandmother, and a de facto mother and father all rolled up into one does not have a liberty interest sufficiently like that of a parent to support an action under section 1983." <u>Ellis v.</u>

Hamilton, 669 F. 2d 510, 513 (7th Cir.), cert. denied, 459 U.S. 1069 (1982).[4] *See also* Osborne v. County of Riverside, 385 F.Supp.2d 1048, 1054 -1055 (C.D. Cal. 2005) ("while close relatives, such as aunts, have no liberty interest in familial integrity or association with related children, such as nieces, 'by virtue of genetic link alone,' close relatives who have 'a long-standing custodial relationship' with related children such that together they constitute an 'existing family unit' possess a liberty interest in familial integrity and association.").

The Second Circuit has also recognized that under certain circumstances, individuals who are not parents may have a protected liberty interest in their relationships with their biologically related minor relatives, even when they lack legal custody. For example, the court has held that foster parents with a blood relationship to the child, including grandparents, "have a liberty interest in preserving the integrity and stability of [their] family." Rivera, supra, 696 F. 2d at 1024-1025.[5] *See* Balbuena v. Mattingly, 2007 WL 2845031, *6 (S.D.N.Y. 2007).[6] "Certainly, where a biological relationship exists, the power of the state to regulate activity is limited." Rivera, supra, 696 F. 2d at 1025.

---

[4] Ellis similarly involved a grandparent who cared for her grandchildren after they were abandoned by their biological parents.

[5] In Rivera, supra, the court noted that biologically related foster parents may have a constitutionally protected interest in preserving that family unit, based on a variety of factors, including the amount of conflict between the wishes of the biologically-related foster parent and biological parents. Based upon the limited record before me, the wishes of Jerome Walsh, Sr. are unclear. Although he appeared at School 72, after Ms. Eisenbeis reported the alleged abuse, indicating that he had legal custody of the grandson, at the neglect proceeding it was noted that he could not be located. Affidavit of Denise Malican, Esq. [93-2], Ex. F, p. 2.

[6] "Legal custody of a child in foster care remains with the agency that places the child, not with the foster parents", In re G.B., 2005 WL 1124261, *9 (N.Y. Fam. Ct. 2005).

The authorities relied upon by defendant Eisenbeis (Eisenbeis' Memorandum of Law [92-10], p. 3) do not compel a different conclusion. In Troxel v. Granville, 530 U.S. 57 (2000) the non-custodial grandparents successfully petitioned for visitation rights to their grandchild over the objection of the grandchildren's biological mother under a state law permitting *any* person to petition for visitation rights. Id. at 60-61. The plurality held that the state law interfered with the fundamental right of a mother to raise her own children. Id. at 75.

However, plaintiff is not alleging that his right to visit his grandson was violated.[7] Rather, giving him every favorable inference as a *pro se* litigant, it appears that plaintiff is alleging that he has a constitutionally protected interest in preserving the family unit he established with the grandson.

### B. Plaintiff has Established a Triable Issue of Fact as to Whether a Due Process Violation Occurred

"While 'the State has a profound interest in the welfare of the child,' interference with family integrity must comport with procedural and substantive due process . . . . Procedural due process generally requires a hearing prior to depriving a parent of custody or a prompt post-deprivation hearing if the child is removed under emergency circumstances. . . . Substantive due process protects individuals from arbitrary government intrusions by requiring a reasonable basis or justification for such actions." Velez v. Reynolds, 325 F. Supp. 2d 293, 303 (S.D.N.Y. 2004).

---

[7] There is no constitutional right to visitation by grandparents. *See, e.g.*, Finch v. City of New York, 591 F. Supp. 2d 349, 359 (S.D.N.Y. 2008) ("Finch points to no federal case law supporting a constitutional right to visitation by grandparents, nor did this Court discover any such federal case law.").

"The seizure of a child without prior court authorization is permitted only in 'exigent circumstances' where the danger to the child's health or safety is so imminent that there is not sufficient time to seek judicial authorization." Id. However, "the right of [plaintiff] is less compelling than the right of a biological, custodial parent, and therefore lesser procedural protections may be consistent with due process." Morrell v. Mock, 270 F.3d 1090, 1095 (7th Cir. 2001), cert. denied, 537 U.S. 812 (2002).

Ms. Eisenbeis argues that faced with the grandson's allegations, which were corroborated by bruising on his arm, as well as her previous observation that he appeared ungroomed and to be afraid of plaintiff (affidavit of Denise Malican, Esq. [92-3], Ex. D, pp. 47, 59, 61) she had an obligation to remove the grandson from plaintiff's custody. Defendant Eisenbeis' Memorandum of Law [92-10], p.3. However, in opposition to her motion, plaintiff offers a February 23, 2009 affidavit from the grandson stating, *inter alia*, that on January 13, 2000, "Ms. Eisenbeis told me that she could arrange my seeing my dad if I would only say that 'my grandfather beats me.' I went along with this and Mrs. Eisenbeis contacted my father and told him to petition the Family Court for custody, she would get others to back up the story that I was mistreated by my grandfather . . .". Plaintiff's Opposition [99], Ex. B, ¶6.

Although I have doubts about the credibility of these statements, "at the summary judgment stage, the court 'is not to weigh the evidence' and must 'eschew credibility assessments'; moreover, '[t]he evidence of the non-movant is to be believed.' " Lisowski v. Reinauer Transportation Co., Inc., 2009 WL 763602, *12 (E.D.N.Y. 2009). Under this standard, a reasonable finder of fact could conclude that defendant Eisenbeis lacked an objectively reasonable basis for reporting the abuse and refusing to return the grandson to plaintiff's custody

without any type of hearing, which would constitute a violation of plaintiff's due process rights. *See* Wilkinson ex rel. Wilkinson v. Russell, 182 F. 3d 89, 104 (2d Cir. 1999), cert. denied, 528 U.S. 1155 (2000) (recognizing that although the state has a compelling interest in the protection of minor children, "[t]his competing interest, though compelling, is not so compelling as to derogate a parent's constitutional rights completely. Case workers cannot be free to substantiate a claim of abuse, for instance, by ignoring overwhelming exculpatory information or by manufacturing false evidence").

### C. Qualified Immunity

Defendant Eisenbeis argues that even if her conduct constituted a due process violation, New York State Social Services Law ("N.Y.S.S.L.") §413 requires certain persons, including school administrators, to file a report "when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child", and that N.Y.S.S.L. §419 gives these 'mandated reporters' qualified immunity from civil liability in connection with reports of suspected child abuse made in good faith.

However, "the immunity afforded by Social Services Law §419 applies only to the state law claims, and not to the federal claims pursuant to section 1983, inasmuch as the determination of the immunity to be accorded in a section 1983 suit is entirely a question of federal law . . . . Immunity pursuant to federal law must be determined pursuant to the standards of federal qualified immunity". Cornigans v. Mark Country Day School, 2006 WL 3950335, *9 (E.D.N.Y. 2006). *See also* Phelan ex rel. Phelan v. Torres, 2005 WL 4655382, *13 (E.D.N.Y. 2005) ("The Supreme Court has made it clear . . . that '[c]onduct by persons acting under color

of state law which is wrongful under 42 U.S.C. §1983 . . . cannot be immunized by state law.'. . . Here, the statutory immunity provision cited by defendants, Social Services Law Section 419, does not confer immunity on City officials for the type of violations alleged here even under state law.").

However, Ms.Eisenbeis may still attempt to invoke federal common law qualified immunity. "The 'personal privilege[s] of absolute or qualified immunity . . . are available to governmental officials only with respect to damage claims asserted against them in their individual capacities.'" Pinaud v. County of Suffolk, 52 F. 3d 1139, 1146 (2d Cir. 1995).[8] "A government employee sued in her individual capacity for damages arising out of her performance of discretionary functions is entitled to qualified immunity where it was objectively reasonable to believe that her acts did not violate clearly established federally protected rights." Gottlieb v. County of Orange, 84 F. 3d 511, 518 (2d Cir. 1996).

"'[P]rotective services caseworkers [must] choose between difficult alternatives. . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.'" Tenenbaum v. Williams, 193 F. 3d 581, 596 (2d Cir. 1999), cert. denied, 529 U.S. 1098 (2000).

---

[8] Although the Amended Complaint only expressly indicates that Ms. Eisenbeis is being sued in her official capacity, Amended Complaint [61], ¶4, it has been treated as asserting both individual and official capacity claims. *See* Judge Skretny's November 18, 2004 Decision and Order [10], dismissing plaintiff's claims against the municipal defendants (City of Buffalo and Buffalo School District), but allowing his claims to proceed against Eisenbeis in her individual capacity.

Based upon the grandson's affidavit, plaintiff has raised a triable issue of fact as to whether Ms. Eisenbeis had an objectively reasonable basis for her decision to take steps to remove the grandson from plaintiff's custody. In view of this factual issue, defendant Eisenbeis' entitlement to qualified immunity cannot be resolved as a matter of law.

## CONCLUSION

For these reasons, I recommend that defendant Eisenbeis' motion for summary judgment [92] be DENIED. Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Rule 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the

proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.</u>


**SO ORDERED.**

DATED:   July 2, 2009

                                            /s/ Jeremiah J. McCarthy
                                            JEREMIAH J. MCCARTHY
                                            United States Magistrate Judge